# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 05-1170/1171

_____

| | | |
|---|---|---|
| Ace Telephone Association; Hometown Solutions; Hutchinson Telecommunications, Inc.; Mainstreet Communications, LLC; Northstar Access, LLC; Otter Tail Telecom, LLC; Paul Bunyan Rural Telephone Company; Tekstar Communications, Inc.; US Link, Inc., | * * * * * * * * * | |
| Appellees, | * * | Appeals from the United States District Court for the District |
| v. | * * | of Minnesota. |
| Leroy Koppendrayer, in his official capacity as Chairman of the Minnesota Public Utilities Commission; R. Marshall Johnson, in his official capacity as a member of the Minnesota Public Utilities Commission; Kenneth Nickolai, in his official capacity as a member of the Minnesota Public Utilities Commission; Phyllis Reha, in her official capacity as a member of the Minnesota Public Utilities Commission; Gregory Scott, in his official capacity as a member of the Minnesota Public Utilities Commission; The Minnesota Public Utilities Commission, | * * * * * * * * * * * * * * * * | |
| Appellants, | * * | |

Qwest Corporation,                             *
                                               *
        Intervenor Defendant/Appellant.   *
                                 _____

                        Submitted:  September 12, 2005
                           Filed:  December 29, 2005
                                 _____

Before ARNOLD, HANSEN, and GRUENDER, Circuit Judges.
                                 _____

ARNOLD, Circuit Judge.

        The Minnesota Public Utilities Commission (MPUC) and Qwest Communications, Inc., appeal the district court's grant of a motion for judicial review and declaratory relief.  We reverse.


                                       I.

        The phone companies that filed the motion, Ace Telephone Association, Hometown Solutions, Hutchinson Telecommunications, Inc., Mainstreet Communications, LLC, NorthStar Access, LLC, Otter Tail Telecom, LLC, Paul Bunyan Rural Telephone Company, Tekstar Communications, Inc., and US Link, Inc., are so-called competitive local exchange carriers (CLECs), *i.e.*, they compete to provide local telephone service.  We will refer to the phone companies that brought this court action as the CLEC Coalition.

        The Coalition's members compete in the Minnesota local telecommunications market against Qwest, and thus Qwest customers and CLEC customers often call one another.  When this occurs, federal law allows the telephone company of the person called to collect from the caller's telephone company the additional costs, if any, that it incurred in sending the call to its final destination, referred to as "terminating the call." *See* 47 U.S.C. § 251(b)(5).  Evidently because both parties frequently agree to

pay one another the costs of terminating calls, the charge in telecommunications parlance is known as "reciprocal compensation." This charge can be set either through negotiations by the carriers or by the state utilities commission. Here the MPUC set the reciprocal compensation rate (RCR) for Qwest and members of the CLEC Coalition at zero. The CLEC Coalition argues that the MPUC's action was arbitrary and capricious and not supported by substantial evidence. The MPUC and Qwest disagree and contend that the MPUC's decision was neither arbitrary nor capricious and was properly based on evidence generated in a related MPUC proceeding. In addition, Qwest maintains that an order entered in the related proceeding required the MPUC to set the RCR at zero.

The CLEC Coalition's motion for judicial review and declaratory relief is a creature of 47 U.S.C. § 252(e)(6), a provision of the Telecommunications Act of 1996 (the Act) that empowers federal district courts to review state commission determinations like the one challenged here to ensure that they meet the requirements of § 251 and § 252. We review the district court's order granting the CLEC Coalition's motion *de novo*, applying the same standards as the district court. *Cf. Luckes v. County of Hennepin*, 415 F.3d 936, 938 (8th Cir. 2005). These standards require us to review a state commission's interpretation of federal law *de novo*. *See Qwest Corp. v. Minnesota Pub. Utilities Comm'n*, 427 F.3d 1061, 1064 (8th Cir. 2005); *Michigan Bell Tel. Co. v. MFS Intelenet of Mich., Inc.*, 339 F.3d 428, 433 (6th Cir. 2003). But we recognize the state commission's superior technical expertise, and we review its factual determinations under the arbitrary and capricious standard, *see Qwest*, 427 F.3d at 1064; *Michigan Bell Tel. Co. v. MCIMetro Access Transmission Servs., Inc.*, 323 F.3d 348, 354 (6th Cir. 2003).

## II.

One of the purposes of the Act is to foster competition in local telephone markets. It offers so-called incumbent local exchange carriers (ILECs), *i.e.*, in general, dominant providers of local telephone service in a particular region, *see*

47 U.S.C.A. § 251(h), the opportunity to compete in the long-distance market; to gain entry, however, an ILEC must facilitate competition for local service. It does so by entering into interconnection agreements with competing carriers and leasing elements of its network to them at cost-based rates. *See* 47 U.S.C. § 271(c)(2)(B). The Act prefers that these rates be set through negotiation, *see* 47 U.S.C. § 252(a), but when the ILEC and the competitor cannot agree upon a rate they may turn to the state commission. The state commission is to set the lease rate based on the total long-run incremental costs of the network element at issue. 47 C.F.R. §§ 51.501, 51.505. To make sure that competitors make efficient investment and operating decisions, it is vital that competing telephone companies, when leasing equipment, face the same costs that the ILEC faces: For instance, if Qwest (an ILEC) incurs some small cost for every minute that a switch is used, then its competitors should as well. Otherwise, competitors may over- or under-consume network resources, which would undermine effective competition in the local exchange market. For that reason, state commissions must set lease rates that reflect an ILEC's actual cost structure. *See In re Implementation of the Local Competition Provisions in the Telecommunications Act of 1996*, First Report and Order, 11 FCC Rcd 15499, 15874 para. 743 (1996) (Local Competition Order) (subsequent history omitted).

In a previous proceeding brought by AT&T and Worldcom (both CLECS though not plaintiffs here), the MPUC set out to determine the rates at which Qwest should lease certain network elements to CLECs. One such element was end-office switching. An end-office switch routes telephone calls to their final destination. Previously, Qwest had charged competitors $1.08 per month for each telephone line connected to a switch, as well as $0.00181 for each minute that they used the switch. While Qwest argued in favor of continuing this pricing structure, the CLEC Coalition and others contended that the per-minute part of the charge was outdated and that the MPUC should price end-office switching at a fixed, per-line rate only.

After hearing testimony in the network-element proceeding, the MPUC's administrative law judge concluded that the most reasonable method for leasing end-office switching was on a fixed, per-line basis. The ALJ concluded that Qwest's cost model was out-of-date and not adequately supported by the evidence in the record. The ALJ also noted that allowing Qwest to charge a usage-sensitive fee while competitors charged customers a fixed rate for their telephone service would stifle competition. The MPUC adopted the ALJ's report and required Qwest to submit a compliance filing listing the charge for the end-office switch at a fixed, monthly, per-line rate with no per-minute usage charges.

In its compliance filing, Qwest priced end-office switching at a fixed rate of $3.12 per line per month, with no per-minute usage charge. In that same filing, Qwest also set its RCR at zero. (The previous RCR had been $0.00181 per minute, the same rate that Qwest had charged competitors when leasing them an end-office switch). The regulations promulgated pursuant to the Act require that, except in limited circumstances, the ILEC and all CLECs in the state pay one another the same rate for terminating each other's calls (RCR). 47 C.F.R. § 51.711(a). Like Qwest, therefore, CLEC Coalition members would collect nothing for terminating another carrier's call. A CLEC could deviate from this zero rate only by developing its own cost study and proving to the MPUC that its costs were higher than Qwest's. 47 C.F.R. § 51.711(b).

After complaints from the CLEC Coalition, the MPUC opened a separate proceeding to investigate the proper RCR. After the issue had been briefed and argued, the MPUC decided to approve Qwest's zero RCR. In doing so, the MPUC cited the Act, which states that the RCR should be merely "a reasonable approximation of *the additional costs* of terminating such calls." 47 U.S.C. § 252(d)(2)(A)(ii) (emphasis added). Since the provision of the Act that addresses the RCR does not "authorize ... any State commission to engage in any rate-regulation proceeding to establish with particularity the additional costs of transporting or

terminating calls," 47 U.S.C. § 252(d)(2)(B)(ii), the MPUC felt it proper to use the earlier network-element proceeding to establish the RCR.

### III.

The Coalition argues, and the district court held, that the MPUC's decision to order a zero RCR was arbitrary and capricious. With respect to reviewing the MPUC's factual determinations, we believe that the arbitrary-and-capricious standard is the same as the substantial-evidence standard. *See GTE South, Inc. v. Morrison*, 199 F.3d 733, 745 & 745 n.5 (4th Cir. 1999); *cf. Association of Data Processing v. Fed. Reserve Sys.*, 745 F.2d 677, 683 (D.C. Cir. 1984). As long as the MPUC's factual findings are supported by substantial evidence in the record as a whole, we will uphold those findings and the reasonable inferences that the MPUC drew from them. *See Michigan Bell Tel. Co. v. MCIMetro Access Transmission Servs., Inc.*, 323 F.3d 348, 354 (6th Cir. 2003).

We conclude that the district court erred in holding that the MPUC's decision was arbitrary and capricious. Under federal law, the MPUC was to base the RCR on "a reasonable approximation of the additional costs" of termination. 47 U.S.C. § 252(d)(2)(A)(ii) (emphasis added). Furthermore, Minnesota law required the MPUC to assume the use of "the most efficient telecommunications technology currently available." Minn. Stat. § 237.12(4)(1). The MPUC therefore could not continue to impose an RCR that it concluded was founded on "clearly outdated cost studies." Instead, it had to make a reasonable approximation of what additional costs, if any, telephone companies incurred in terminating a call. To do so, the MPUC looked back to its recent network-element proceeding.

In the network-element proceeding, the ALJ recognized that usage-based costs were theoretically possible, but determined that no party had actually demonstrated that usage-based costs in fact existed or, if they did, how much they were. In that proceeding, the MPUC accepted the ALJ's reasoning, and it determined that all the

costs of the end-office switch were arguably recovered through the fixed-rate price. The MPUC thus had reason to believe in the RCR proceeding that the costs of modern end-office switching did not vary significantly with usage. Multiple parties in the earlier proceeding had introduced evidence consistent with that supposition. On this record, the MPUC reasonably concluded that the additional costs for terminating a telephone call were approximately zero.

The MPUC was entitled to look to the previous network-element proceeding when deciding the appropriate RCR. We know of no rule that limits a regulatory agency to considering evidence within a particular record in making a decision; instead, it may use findings made in one context to help decide a related matter in another. The CLEC coalition was a party to the previous proceeding. All the parties to the RCR proceeding recognized that the end-office switch issue and the reciprocal compensation issue were economically related inquiries. FCC regulations permitted the MPUC to use the same "forward-looking, economic cost-based pricing standard" for both proceedings. *See Local Competition Order*, 11 Fcc Rcd at 16023 para. 1054. In fact, the MPUC established the earlier $0.00181 RCR using the same information that was used to establish the previous end-office switch lease rate. And the CLEC Coalition members, in their initial comments to the MPUC concerning reciprocal compensation, repeatedly referred to the previous record. Rather than reinvent the wheel, the MPUC looked back to the network-element proceeding to supplement the record in the instant matter. The parties had ample opportunity in the reciprocal-compensation proceeding to present contrary evidence. Because the findings from the network-element proceeding were relevant to the reciprocal-compensation proceeding, and because the FCC permitted state commissions to use a similar standard in addressing both issues, the MPUC did not err in considering the earlier record.

We also conclude that the district court erred in holding that a zero RCR violated the plain language of the Act. The court relied on 47 U.S.C. § 251(b)(5), which states that each local exchange carrier has "[t]he duty to establish reciprocal

compensation arrangements for the transport and termination of telecommunications." It is true that each carrier has to set up procedures by which to pay other carriers for the costs of terminating its traffic, and a carrier would violate the Act if it simply refused to establish any way to reimburse others for their additional costs. But this duty to deal does not necessarily imply that the RCR must be some non-zero amount. An ILEC like Qwest can collect reciprocal compensation charges from others only if it negotiates a non-zero rate with them or if the state commission finds that it incurs additional costs in terminating other carriers' traffic, *see* 47 U.S.C. § 252(d)(2)(A)(ii). Put another way, telephone companies have to establish ways to pay one another their additional costs. But if no additional costs are incurred, there is nothing to pay. The district court's reading of § 251(b)(5) would force carriers to pay one another regardless of whether they incurred additional costs or not. Such a reading would directly contradict the plain meaning of § 252(d)(2)(A)(ii). For the reasons indicated, the district court erred in reversing the MPUC's order.

## IV.

We conclude, moreover, that the district court's order must be reversed for another, independently sufficient reason: Once the MPUC ordered Qwest to charge only a fixed per-line rate for end-office switching, federal law prevented the MPUC from imposing any non-zero RCR.

The Act, as the Supreme Court has noted, is often difficult to interpret. *AT&T Corp. v. Iowa Utils. Bd.*, 525 U.S. 366, 397 (1999). This is true of the term "additional costs" as used in § 252(d)(2)(A)(ii); it is hardly free from ambiguity. But the Federal Communications Commission (FCC) has clarified the meaning of the phrase. In its first order implementing the local competition provisions of the Act, the FCC stated that "the 'additional cost' to the LEC of terminating a call ... primarily consists of the traffic-sensitive component of local switching." *Local Competition Order*, 11 FCC Rcd at 16024-25 para. 1057. After finding that the cost of other related network elements do not vary with traffic, the FCC turned to the end-office

switch.  It determined that "only that portion of the forward-looking, economic cost of end-office switching *that is recovered on a usage-sensitive basis* constitutes an 'additional cost' to be recovered through termination charges."  *Id.* (emphasis added). Regulations promulgated by a federal agency pursuant to an act of Congress carry with them the force of law.  *See Chevron U.S.A. Inc. v. NRDC*, 467 U.S. 837, 843-44 (1984).

The phrase "is recovered on a usage-sensitive basis" is, we think, best read as referring to the usage-based portion of the end-office switch lease rate.  It would make little sense to say that this phrase refers to the recovery of termination charges themselves.  We agree with Qwest that this phrase refers to the usage charge that is recovered when the end-office switch is leased as a network element.  Therefore, if a state commission decides that the switch should be leased on a fixed, per-line basis, paragraph 1057 precludes it from establishing a non-zero termination charge for that same switch.  This is the case regardless of the state commission's rationale for the fixed-rate pricing.  Paragraph 1057 looks to the MPUC's action, not to its motivation. It is immaterial whether the MPUC ordered a fixed rate for cost-based or public-policy considerations.

Once the MPUC determined that there were no grounds for a per-minute usage-based charge on end-office switching and that there were public policy reasons to impose only a fixed-rate price, the die was cast.  The CLEC Coalition asked for a fixed end-office switching lease rate, and the MPUC gave them one.  The consequences of that decision may prove more costly than the Coalition expected, but we believe that that is what the law requires.

## V.

For the reasons stated above, we reverse the district court's order granting the motion for judicial review and declaratory relief.

_____